**Kerry COPSEY, et al.**

v.

**Jerry SWEARINGEN, et al.**

**Civ. A. No. 88–776–A.**

United States District Court,
M.D. Louisiana.

April 23, 1991.

Theodore A. Schirmer, Stephen A. Dixon, Baton Rouge, La., for plaintiffs.

Jenifer Schaye, Asst. Atty. Gen., La. Dept. of Justice, Div. of Risk Litigation, Baton Rouge, La., for defendants.

## RULING ON MOTIONS

### JOHN V. PARKER, Chief Judge.

This matter is before the court on motion of defendants, John Alario, Samuel B. Nunez, Jerry Swearingen, Sylvia Duke, Barbara Goodson, Guy Dicharry, Phillip Reichert, Mitchell Stockman, Charles Schwing and the Foundation for Historical Louisiana, for summary judgment and the motion of plaintiffs to join an additional defendant. Timely opposition has been filed to both motions. The court has heard oral argument. Subject matter jurisdiction is allegedly based upon 28 U.S.C. § 1331.

Because of the result which the court reaches on the motion for summary judgment on behalf of defendants, plaintiffs' motion to join an additional defendant is hereby DENIED.

The following facts are undisputed:

### I. The Parties

Plaintiff, Kerry Copsey, is a participant in the Randolph Sheppard Vending Facility Program operated by the State of Louisiana. Under the terms of the program, blind persons such as Kerry Copsey are given preferential treatment in operating concession stands in public buildings. Plaintiff, Cindy Copsey, is Kerry Copsey's wife.

The named defendants are: (1) Jerry Swearingen, the Director of Blind Services, (2) Guy Dicharry, (3) Phillip Reichert, and (4) Mitchell "Homer" Stockman, who all hold positions subordinate to Swearingen in the Division of Blind Services, (5) John Alario, who was at all material times the Speaker of the Louisiana House of Representatives, (6) Samuel B. Nunez, who was at all material times the President of the Louisiana Senate, (7) Charles Schwing, who has served from 1982 until the present as the state capitol architect under contract with the Legislative Budgetary Control Council, (8) Sylvia Duke, administrative officer, a member of the Louisiana Senate staff, (9) Barbara Goodson, a member of the staff of the House of Representatives and (10) the Foundation for Historic Louisiana, a private non-profit corporation incorporated under the laws of Louisiana.

### II. Facts

The following facts are undisputed:

Louisiana, through its Department of Health and Human Resources, has established a program for conservation of sight, prevention of blindness and vocational training and rehabilitation for the blind, known as the Randolph Sheppard Vending Facility Program. See LSA–R.S. 46:331. Under the terms of LSA–R.S. 46:333, blind persons are given preferential treatment in operating concession stands in public buildings. There is a division of Blind Services in the Department of Health and Human Resources which administers the rehabilitational program and issues licenses to persons who participate in it.

Allocation of space in the state's unique skyscraper state capitol is controlled by the Louisiana Legislature. The provisions of LSA–R.S. 49:150.1 allocate space to some executive officers in the capitol and then provide that all other "areas of the state capitol, pentagon courts buildings and Old Arsenal Museum ... shall be for the sole use of the legislature, its agencies and officers and the employees of the legislature and its agencies." In allocating space, the Louisiana Legislature acts through the Legislative Budgetary Control Council, created by LSA–R.S. 24:38. At all times relevant to this case, defendants, Alario and Nunez, served as co-chairmen of the Budgetary Control Council.

Although the record does not establish specific dates, a concession stand was at one time operated under the auspices of the Division of Blind Services by a blind vendor

in the 27th floor observation tower of the capitol. Again, the record does not disclose a precise date, but at some time the observation tower and some other portions of the capitol were closed for renovations and the concession stand was also closed.

In July, 1985, apparently when the renovations were nearing completion, the Budgetary Control Council, through Nunez and Alario, entered into a contract with the Division of Blind Services, "for the purpose of enabling the department to establish and operate a vending machine stand in the Louisiana State Capitol." The contract provides: "Location and description of space to be used as follows: Designated area in the breezeway, basement level of the Louisiana State Capitol." As far as the record shows, no person was licensed to operate this concession stand until plaintiff, Kerry Copsey, was licensed in February, 1987.

On May 14, 1986, the Budgetary Control Council, through Nunez and Alario, entered a lease contract with the Historical Foundation under the terms of which the Budgetary Council leased to the Foundation "the management of the Capitol Complex Visitor Center, which is the Southeast One Quarter (¼) of Building 'C,' Pentagon Barracks, Baton Rouge, Louisiana, and the management of the observation tower on the 27th floor of the Louisiana State Capitol Building, Baton Rouge, Louisiana."

Renovations to the observation tower apparently having been completed, the Foundation promptly occupied the tower and began operation of what it terms "a museum shop."

As stated above, in February, 1987, plaintiff, Mr. Copsey, was licensed to operate the vending concession stand in the basement of the capitol by the Division of Blind Services.

At some point in time, Mr. Copsey became dissatisfied with the administration of the program and apparently made many complaints to Swearingen and his staff. Mr. Copsey, relying upon his own construction of LSA–R.S. 46:333, determined that he, as the licensed blind vendor in the basement of the capitol, was entitled to exclu-sive concession stand rights throughout the building, including the observation tower area already occupied by the Historical Foundation. Mr. Copsey made many demands upon the Division of Blind Services, including that he be allowed to occupy the observation tower in place of the Historical Foundation.

In late May or early June, 1987, Mr. Copsey caused a five and one-half page letter, addressed to the National Foundation of the Blind, to be distributed to the public and the news media in the capitol. The letter was critical of the manner in which the program was administrated by the Division of Blind Services, critical of employees of the Division as well as the Historical Foundation and many others. At about that time, Mr. Copsey was apparently interviewed by a reporter for a local television station which broadcast that interview. While no transcript of that broadcast has been filed in the record, it is safe to assume that Mr. Copsey continued his public criticism.

In mid-June, 1987, Swearingen sent Mr. Copsey a memorandum declaring that Mrs. Copsey would no longer be allowed to visit her husband's concession stand during business hours. It is undisputed that this directive was quickly withdrawn, although the record does not reveal the exact date.

Relations between Mr. Copsey and the Division of Blind Services did not improve and on September 10, 1987, Mr. Copsey received a letter from Mr. Swearingen which terminated his participation in the program. At Mr. Copsey's request, a second letter was prepared by Mr. Swearingen which sets forth the reasons for the termination. Jerry Swearingen's letter to plaintiff outlined the reasons for plaintiff's termination as follows: (1) Publicity adverse to the program on Baton Rouge Channel 2 and in letters to the National Federation of the Blind, both stimulated by you (Kerry Copsey), (2) Continued reports from individuals, primarily building management, as to your complaints about the facility and the Capitol, (3) Concerns voiced by several other operators over the negative impact on the program of your accusations adverse to

the agency and the program and other information released by you to the press, (4) Contacts directly with specific Senators and Representatives regarding various areas of your dissatisfaction and (5) Contacts with suppliers and others after policy violations were specifically brought to your attention.

The rules and regulations governing the Blind Services program provide that any vendor whose license is terminated is entitled to "a full evidentiary hearing." On September 17, 1987, Mr. Copsey requested such a hearing. Subsequently, the Division of Blind Services requested that the appeals section of the Department of Health and Human Resources name an administrative law judge. Such a judge was named and after several conferences and continuances, a hearing was fixed for February 10, 1988. On February 9, 1988, Mr. Swearingen delivered a letter to Mr. Copsey which vacated the September 10, 1987 termination letter. At the hearing the next day, the parties and their lawyers conferred among themselves and entered the following stipulations:

1. The appellant, Kerry Copsey, is reinstated into the Vending Facility Program operated by Blind Services retroactive to the date of September 10, 1987. Mr. Copsey is to execute a copy of the contract which had been presented to him prior to February 24, 1988.

2. The said appellant, Kerry Copsey, is further to be compensated at a rate of $720.00 a month from September 10, 1987 until such time as he is no longer with the Agency or until such time as the parties enter into an agreement establishing a different compensation.

3. Kerry Copsey, the appellant, is to be reimbursed in the amount of $500.00 for attorney's fees incurred.

4. Certain letters and information as set out by Blind Services, which had been included in the file of Kerry Copsey are to be removed from the files of Kerry Copsey as maintained by Blind Services.

5. In the letter of February 9, 1988 in which the State rescinded its action, it also requested a probationary hearing, requesting that Mr. Copsey be on proba-

tion for a thirty day period. At the request of both parties, there will be a hearing on February 24, 1988 to determine whether Mr. Copsey shall be reinstated at the Vending Facility at the State Capitol, which he was operating prior to his termination.

The administrative law judge adopted the stipulations of the parties as his decision, thus ordering Mr. Copsey to be reinstated retroactive to the date of his termination, together with the compensation and attorney's fees specified.

On February 24, 1988, the hearing regarding Mr. Copsey's probation was held, after which the administrative law judge concluded that the Division of Blind Services had not established cause for placing Mr. Copsey on probation and appropriate findings were entered.

In support of the motion for summary judgment, the defendants have filed an affidavit on behalf of each of the defendants, including the Foundation, except defendant Guy Dicharry, declaring that each of them has never conspired with others to deprive either Kerry or Cindy Copsey of freedom of speech, of association or of due process of law. Plaintiffs have filed no affidavits or other evidence which specifically contradicts the allegations of these affidavits, relying instead upon the somewhat vague, general and conclusory allegations of the complaint.

III. Procedural History

This action was commenced on September 9, 1988.

Plaintiffs assert assorted claims against the various defendants for money damages and for unspecified injunctive relief.

Plaintiffs have sued the officials who allegedly conspired and acted in bad faith in having Mr. Copsey's license revoked. Although plaintiffs' original complaint listed a myriad of constitutional violations, this court dismissed several claims in ruling on a motion to dismiss. Specifically, on August 4, 1989, before his recent recusal, Judge Polozola of this court, to whom this action was originally allotted, dismissed: (1) the plaintiffs' claims against the defen-

dants in their official capacity, (2) the plaintiffs' claims under 42 U.S.C. §§ 1981, 1982, 1985(3) and 1986, and (3) the plaintiffs' claims based on the First Amendment for conduct which occurred during June, 1987.[1]

The remaining claims against the individual defendants and the Foundation are based upon plaintiff Kerry Copsey's claims that his license was terminated for exercising his First Amendment right to free speech, that he was denied procedural due process and that the defendants have deprived him of property rights acquired under state law, specifically LSA–R.S. 46:333. These claims serve as the subject matter of this motion.

## IV. Eleventh Amendment

■ The state defendants argue that the Eleventh Amendment precludes this action against the named defendants and that under Fifth Circuit precedent, a claim that state officials have violated state law in carrying out their official responsibilities is a claim against the state and as such is subject to the Eleventh Amendment.

In *Ex parte Young,* the Supreme Court held that a state official cannot invoke the shield of sovereign immunity if the official has acted in violation of the Constitution. *Ex parte Young,* 209 U.S. 123, 159, 28 S.Ct. 441, 454, 52 L.Ed. 714 (1908). Under *Young,* when a state officer acts unconstitutionally, he is acting outside his authority and is "stripped of his official or representative character." *Id.* at 160, 28 S.Ct. at 454. See also *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 101, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984). In the present case, plaintiffs allege only federal constitutional violations.

In support of their position, defendants cite *Hughes v. Savell,* 902 F.2d 376 (5th Cir.1990), a case which dealt only with alleged *pendent state law claims.* The issue addressed by *Hughes,* was whether an action by an inmate against a correctional officer for damages resulting from the correctional officer's negligence (state law claim) can be heard in federal court. The court held that because, as a matter of state law, Louisiana is liable for the negligence of its employees in failing to protect an inmate, any suit against the correctional officer is a suit against the state and therefore barred by the Eleventh Amendment. *Hughes,* 902 F.2d at 378. This result ensues even where the correctional officer is sued in his individual capacity. *Id.*[2]

Defendants misstate the claims of plaintiff, Kerry Copsey. Mr. Copsey asserts no claim for damages (cause of action) under Louisiana law. *All* the claims are federal claims. The claim relating to LSA–R.S. 46:333 is a federal claim under 42 U.S.C. § 1983. Its thrust is that the defendants, acting under color of state law, have, in violation of the Fourteenth Amendment, deprived him of a property interest which he acquired under state law, specifically section 333. Such a claim might require that this court construe the statute in order to determine whether it does confer a property right upon him. Federal courts, however, regularly examine state laws in order to determine whether they confer property interests entitled to due process protection under the Fourteenth Amendment. See e.g. *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972) and its progeny.

---

1. Magistrate Riedlinger in his report, which was adopted by this court, describes the June 1987 events which have prescribed as, "plaintiffs' claims against the defendants based upon barring his distribution of a letter and prohibiting visits from Cindy Copsey." Thus, Mrs. Copsey's claims have been dismissed.

2. Louisiana has abolished sovereign immunity for all claims "in contract or for injury to person or property." See La. Const., 1974, Art. 12, Sec. 10. The liability of the state for negligent

acts of correctional officers arises under Article 2320 of the Louisiana Civil Code which makes "the master" liable in solido with the "servant" for "damages occasioned by the servant." Thus, to the extent that the case might be construed to imply that only the state incurs liability for acts of its employees, *Hughes* is clearly in error as to Louisiana law. See e.g. *Foster v. Hampton,* 381 So.2d 789 (La.1980), specifically holding that employee and employer are both liable in solido.

Since Copsey asserts no claims under state law, *Hughes* has no application to this case.

Next, defendants advance the notion that the State of Louisiana has, by state statute, expanded sovereign immunity from suit in federal court to include not only the state, but also individual state officers and employees. This argument is predicated upon the adoption by the Louisiana Legislature of LSA–R.S. 13:5108.1 and 5108.2 which provide that the state may indemnify state officers and employees who are cast by federal courts in damages for denial or deprivation of federal civil rights to plaintiffs.

Defendants cite dictum from the *Hughes* decision—an ambiguous footnote which states, "where Louisiana's statutes do require ... indemnification, this circuit has already held that a judgment implicating this statute [LSA–R.S. 13:5108.2] 'is really a suit against the state' barred by the Eleventh Amendment." *Hughes*, 902 F.2d at 379 fn. 5, citing *Voisin's Oyster House v. Guidry*, 799 F.2d 183, 188 (5th Cir.1986); *Peden v. Phelps*, No. 86–3951 slip. op. at 1, 1988 WL 135240 (E.D.La. Dec. 14, 1988); *Dufrene v. Foti*, No. 86–4346, slip. op. at 1, 1986 WL 14181 (E.D.La. Dec. 4, 1986). The cases cited by the *Hughes* court in support of the stated contention do not extend to individual capacity suits. Specifically, the *Voisin* and *Dufrene* courts dealt with official capacity suit, while the *Peden* court actually rejected the argument that the indemnification statute precludes an individual suit on Eleventh Amendment grounds.[3] This court has repeatedly held that Louisiana's indemnification statute does not prevent a suit against a state actor in his individual capacity. See, e.g., *Anderson v. Phelps*, 655 F.Supp. 560, 564 (M.D.La.1985) and *Muhammed v. Bd. of Supervisors of Southern University*, 715 F.Supp. 732, 733 (M.D.La.1989). Language from *Muhammed* explains:

Counsel argues that because the Legislature is authorized to appropriate funds to indemnify Dr. Phills for any judgment that might be rendered against him in this action, '[T]he state of Louisiana is the real party in interest herein.' The argument is patently and fatally flawed. It is *federal* not state law which shields the state from suit in federal court. Neither Louisiana nor any other state has the power to broaden the reach of the Eleventh Amendment to the United States Constitution. The fact that Louisiana, for reasons beyond the ken of this court, has voluntarily elected to indemnify those of its officers who deny or deprive people of their federal civil rights, in no way constitutes that officer as an 'arm' or 'alter ego' of the state for the Eleventh Amendment purposes. The individual defendant remains an individual defendant without regard to whether the state does or does not indemnify him and the plaintiff looks only to the defendant, not the state, for execution of the judgment. *Muhammed*, 715 F.Supp. at 734. (emphasis in original)

Neither *Hughes*, nor the cases cited by *Hughes*, hold differently. Accordingly, this court concludes that under *Ex parte Young*, the Eleventh Amendment does not bar this action.

## V. Qualified Immunity

Defendants next assert qualified immunity. Defendants argue that regarding defendants, Nunez and Alario, plaintiffs make mere conclusory allegations not based upon fact and therefore have not stated a cause of action. Defendants also assert that all individual defendants acted within the scope of their official authority at all times and are therefore entitled to qualified immunity. With regard to the Foundation for Historical Louisiana, defendants allege that plaintiffs have not demonstrated that it acted under color of state

---

**3.** In *Peden* the court stated, "the complaint in the instant litigation sues defendant, Phelps, in both his official and personal capacity. Any judgment against Phelps in his official capacity would be satisfied out of the state treasury. La.Rev.Stat.Ann. 13:5108.1 and 13:5108.2.

Therefore, the suit against Phelps in his official capacity is really a suit against the state, and the Eleventh Amendment bars such a suit ... *However, the suit against defendant, Phelps, in his personal capacity stands. 42 U.S.C. § 1983."* (emphasis added)

law, and therefore plaintiffs cannot maintain a § 1983 action against it.

In response, plaintiffs argue that defendants, Nunez and Alario, terminated Kerry Copsey for exercising his constitutional rights and that the other named defendants directly participated in injuring Mr. Copsey.

■ "Qualified immunity shields government officials performing discretionary functions from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). Whether a defendant asserting qualified immunity may be personally liable turns on the objective legal reasonableness of the defendant's actions assessed in light of clearly established law. *Id.*, 483 U.S. at 639, 107 S.Ct. at 3038. When a plaintiff invokes a clearly established right, the appropriate inquiry is whether "the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates the right." *Id.* at 640, 107 S.Ct. at 3039. If reasonable public officials could differ on the lawfulness of the defendant's actions, the defendant is entitled to qualified immunity. *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). Thus, even if a defendant's conduct actually violates a plaintiff's constitutional rights, the defendant is entitled to qualified immunity if the conduct was objectively reasonable. *Melear v. Spears*, 862 F.2d 1177, 1188 (5th Cir.1989) (Higginbotham, J., concurring).

■ Because the doctrine of qualified immunity is intended to shield officers from the disruptions accompanying a lawsuit, a section 1983 plaintiff must comply with heightened pleading requirements and state with factual detail and particularity the basis of his claim. *Elliott v. Perez*, 751 F.2d 1472, 1473 (5th Cir.1985). Moreover, mere conclusory allegations and bold assertions are insufficient to meet this heightened standard. *Id.* at 1482.

As the Fifth Circuit recently commented:
Consequently the plaintiff in a § 1983 suit "must shoulder the burden of pleading a prima facie case, including the obligation of alleging 'detailed facts supporting the contention that the plea of immunity cannot be sustained.'" *Lynch v. Cannatella*, 810 F.2d 1363, 1376 (5th Cir. 1987), quoting *Morrison v. City of Baton Rouge*, 761 F.2d 242, 245 (5th Cir. 1985). The Supreme Court in *Mitchell v. Forsyth* [472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) ] explained the plaintiff's burden further: "[u]nless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." 472 U.S. at 526, 105 S.Ct. at 2815, quoted in *Jacquez [v. Procunier*, 801 F.2d 789] at 791 [ (5th Cir. 1986) ]. This Circuit has held that "Once a complaint against [an official] ... adequately raises the likely issue of immunity ... the district court should on its own require of the plaintiff a detailed complaint alleging with particularity all material facts on which he contends he will establish his right to recovery, which will include detailed facts supporting the contention that the plea of immunity cannot be sustained." *Nieto v. San Perlita Independent School District*, 894 F.2d 174 (5th Cir.1990).

### A. Procedural Due Process—Property Right Claim

■ While it is clearly established that Copsey's state granted property rights are protected by the Fourteenth Amendment and that all defendant public officers must be held to awareness of that, it is not so clear that state law grants the rights claimed or that the conduct of defendants in not awarding the space in the tower to plaintiff was objectively unreasonable.

The undisputed facts clearly establish that the decision to award the tower space to the Foundation was made by Alario and Nunez in their capacity as co-chairmen of the Budgetary Control Unit. Some of the other state defendants may have made recommendations but the contract with the Historical Foundation was signed by Alario

and Nunez and it is this contract which excludes Copsey from the tower.

Plaintiffs argue that upon his becoming a licensed vendor in February, 1987, LSA–R.S. 46:333 operated to confer upon Mr. Copsey the exclusive right to vending concessions throughout the entire capitol, despite the undisputed fact that the contract between the Legislature and the Division of Blind Services specifies his location as the basement only. Section 333 provides in pertinent part:

A. *State agencies, boards, commissions, and institutions owning,* maintaining, or controlling *state property shall in all cases give preference to blind persons, ... in the operation of vending stands,* vending machines, and other small business concessions to be operated on the premises. *No other vending stands,* vending machines, or small business concessions *shall be operated on the same premises with vending stands,* vending machines, or other small business concessions *operated,* or contemplated, *under the provisions of this Section ...* (emphasis supplied)

Neither side has offered the court any state legal authority constructing the statute. The court notes, however, that other statutes must also be considered. The statute under which Alario and Nunez acted, LSA–R.S. 49:150.1 A, provides:

A. *Notwithstanding any other provision of law to the contrary,* and particularly any contrary provision of R.S. 49.-146, *the allocation and use of space within the state capitol,* pentagon courts buildings, and the Old Arsenal Museum *shall be as provided in this Subpart.* The provisions of this Subpart shall apply to the subbasement, basement, and all floors of the state capitol, all buildings in the pentagon courts, and the Old Arsenal Museum.

Amended by Acts 1987, No. 260, § 1. (emphasis supplied)

The 1987 amendment simply added the Old Arsenal Museum to the list of buildings. None of the emphasized language was changed.

Subpart E provides in pertinent part:

E. (1) *All areas of the state capitol,* pentagon courts buildings, and Old Arsenal Museum not allocated under the provisions of Subsections B and C herein *shall be for the sole use of the legislature, its agencies and officers, and the employees of the legislature and its agencies ...*

Amended by Act 1987, No. 260, § 1. (emphasis supplied)

Again the 1987 amendment simply added the Old Arsenal Museum. The Legislative Budgetary Control Council is granted the administrative authority of the Legislature in regard to the capitol by LSA–R.S. 24.38 and Alario and Nunez were acting as co-chairmen of that Council.

The phrase, "Notwithstanding any other provision of law to the contrary" serves as a powerful indication that the Legislature intended to keep complete control of all space in the capitol in its own hands, even if other laws were to the contrary.

■ In order to claim protection for a property right under the Fourteenth Amendment, plaintiff must first demonstrate that state law clearly grants him such a right. At most, plaintiff has shown that he might plausibly argue that state law confers such a right. Even if this court should conclude that these state laws create a protected property right in plaintiff, it cannot be argued that the right was "clearly established" at the time of these actions by state officials. A plaintiff in a property right claim must show that his property right is clearly established under state law and that a reasonable state official would understand that what he is doing violates the right. *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). Here there are conflicting state statutes, neither of which has been construed by the state courts. By any standard, the conduct of Alario and Nunez was objectively reasonable in executing the contract with the Historical Foundation and hence each is entitled to the defense of qualified immunity. *Edwards v. Gilbert,* 867 F.2d 1271 (11th Cir.1989);

*Birkenholz v. Sluyter,* 857 F.2d 1214 (8th Cir.1988).

To the extent that plaintiff claims that any other state officer or employee participated in the decision to lease the tower space to the Historical Foundation, he or she is also shielded by the qualified immunity defense.

With regard to the remaining claims, and defendants' claim of qualified immunity, it is necessary to break down each claim, note the defendants against which the claim is made and recite the specific allegations against those particular defendants.

### B. *Free Speech I*

█ Plaintiffs allege that on September 10, 1987 defendants, Reichert and Dicharry, hand delivered a letter signed by defendant, Swearingen, which stated that Kerry Copsey's license would be revoked effective at the close of his business that day. The next day, a second letter was allegedly issued by defendant, Swearingen, outlining the reasons for the revocation of Kerry Copsey's license. That letter (quoted above) contains statements which arguably could indicate that Swearingen terminated plaintiff's license in retaliation for plaintiff having expressed his right to publicly speak out on matters of public concern—a well established right protected by the First Amendment.

Plaintiffs allege that Mr. Copsey was told by defendant, Swearingen, that defendants, Nunez and Alario, requested that he leave the building. The day after his license was revoked, plaintiff's vending stand "was subjected to a public inventory" conducted by defendants, Guy Dicharry and Mitchell "Homer" Stockman. Thereafter, plaintiffs allege that defendants, Swearingen, Dicharry, Reichert and Stockman, brought Kerry Copsey before an administrative board to determine whether he should be placed on probation.

### C. *Free Speech II*

Plaintiffs allege that on June 12, 1987, Kerry Copsey was distributing a letter critical of blind services and that in retaliation defendant, Dicharry, sent a memorandum to defendant, Swearingen, stating that Blind Services would "follow our procedure and get this matter cleared." Plaintiffs allege that Swearingen "made no attempt to prevent or aid in preventing the commission of this civil rights violation even though he had knowledge of his capacity to prevent the same." Plaintiffs state that in this memorandum defendant, Dicharry, also noted "that Defendants Duke and Schwing were interested in having the distribution of the letter stopped." Plaintiffs conclude this claim by alleging that somehow the Foundation for Historical Louisiana conspired with other defendants to prevent Kerry Copsey from distributing the above-mentioned letter.

As stated, in an earlier ruling Judge Polozola has held that the free speech claim regarding events occurring in June, 1987, have prescribed.

### D. *Free Association*

Plaintiffs allege that "Defendant Stockman, at Defendant Reichert's request, met with Defendant Schwing and discussed having Cindy Copsey banned from visiting her husband, Kerry Copsey, at his vending stand facility located in the State Capitol during business hours." Plaintiffs allege that defendant Swearingen and Duke knew of this "unconstitutional" denial of plaintiffs' "right to association." Again, Judge Polozola, in adopting Magistrate Riedlinger's recommendation, has dismissed this claim.

### E. *Equal Protection*

In the complaint, plaintiffs argue that totally blind vendors and partially blind vendors are not treated equally. In asserting that Swearingen is responsible for this classification, plaintiffs allege that "Defendant Swearingen developed or enforced or neglected to prevent the enforcement of a policy of discrimination against totally blind persons in the Louisiana Randolph Sheppard Vending facility program."

### F. *Conclusion Regarding Qualified Immunity*

Jerry Swearingen was the only person with authority to terminate Mr. Copsey and

the court concludes that except for Swearingen, the conclusory allegations made in plaintiffs' complaint against all of the individual defendants are insufficient to withstand defendants' assertion of qualified immunity. Moreover, the court concludes that plaintiffs have not stated a claim that the Foundation acted under color of state law or that it took any action to deprive plaintiffs of any constitutional rights.

## VI. Conspiracy

■ As previously noted, the allegations made in the complaint regarding an alleged conspiracy are vague and conclusory. No specific facts are alleged which actually indicate that anyone conspired with anyone else about anything. Each defendant, except defendant Dicharry, has filed an affidavit denying any conspiracy. Plaintiffs have chosen to rely upon the vague allegations of their complaint rather than respond with specific evidence indicating facts to support a conclusion that would lead to conspiracy. The allegations recited demonstrate that plaintiffs have not complied with the heightened pleading requirement as regards the conspiracy claim.

With regard to the Historical Foundation, there is no showing of state action on its part to hold it accountable for any alleged constitutional violations. Moreover, as stated, plaintiff has not sufficiently alleged any conspiracy between any of the defendants, including the Foundation.

In the face of defendants' properly supported motion for summary judgment, plaintiffs have the burden of designating specific evidence in the record, of sufficient caliber and quality to create a genuine issue for trial, such as that a rational finder of fact could return a verdict in his favor. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510–13, 91 L.Ed.2d 202 (1986); *Phillips Oil Co. v. OKC Corp.*, 812 F.2d 265 (5th Cir.1987). Under Rule

56(e), the party opposing the motions "may not sit on its hands, complacently relying" on the pleadings. Plaintiffs' conclusory allegations of "conspiracy" with no supporting evidence are insufficient to raise a genuine issue for trial. *Jacquez v. Procunier*, 801 F.2d 789 (5th Cir.1986); *Fontenot v. Upjohn Co.*, 780 F.2d 1190 (5th Cir.1986).

## VII. Free Speech

Based upon the letter to Kerry Copsey outlining the reasons for the revocation of his license, the court concludes that summary judgment is not appropriate on the issue of whether plaintiff's license was revoked in September 1987 by Swearingen for exercising his First Amendment Rights.

The court also concludes, however, that as a matter of law, plaintiffs have not stated a freedom of association claim and that Kerry Copsey has not sufficiently demonstrated "chilled speech" to withstand the motion.[4]

## VIII. Procedural Due Process—License Termination Claim

■ Plaintiffs claim that Kerry Copsey was denied procedural due process when his license was revoked and that this property deprivation was not cured by the subsequent post-deprivation hearing. Plaintiffs claim that he was not "returned" to the tower after his reinstatement has already been discussed and rejected.

It is clear that Kerry Copsey was not operating in the tower when his license was revoked. Copsey's license was revoked on September 10, 1987.

In *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), the Court states:

> Our past cases mandate that some kind of hearing is required at some time before a State finally deprives a person of his property interests. The fundamental requirement of due process is the opportunity to be heard and it is an opportunity which must be granted at a meaning-

---

**4.** In fact, plaintiff admitted in deposition that he has had no denial of free speech, free association or denial of due process since February of 1988. Furthermore, plaintiff admitted that his wife now freely goes to his vending stand.

ful time and in a meaningful manner ... However, as many of the above cases recognize, we have rejected the proposition that 'at a meaningful time and in a meaningful manner' always requires the State to provide a hearing prior to the initial deprivation of property. *Parratt*, 101 S.Ct. at 1915.

The court concludes that the post deprivation hearing accorded Kerry Copsey did not deprive him of his procedural due process rights. He was returned to the same position he occupied prior to the revocation of his license.

## IX. Conclusion

Accordingly, the motion for summary judgment is hereby GRANTED as to all claims against all defendants except defendant Swearingen. The motion for summary judgment on behalf of Swearingen is GRANTED as to all claims except that he terminated Mr. Copsey's license in retaliation for Copsey's exercise of his First Amendment rights.